v. Ashton-Islam Emirates of Afghanistan. Your Honor, do you mind if I sit on this side? That's fine, sure. So you're splitting this five minutes each, right? Let's see if we can, let's see if we can. And so, Mr. Gershengorn, am I pronouncing that right? You are pronouncing it right. All right, you may proceed. All right. Good morning, Your Honors, and may it please the Court. Ian Gershengorn on behalf of the Joint Creditors, all of whom hold final judgments against the Taliban. Let me start by discussing how this case relates to the previous one. If Your Honors agree that either the DAB assets are not sovereign, either because Afghanistan is no longer a state, or because the DAB is the alter ego of the Taliban, then our case follows a fortiori. In fact, our case is easier because our plaintiffs have final judgments, the writs of attachment in Owens, or pre-judgment attachments, and TRIA, we think, requires. So if we agree with prior counsel, that's the end of that. You say even if we don't, TRIA would give you the right to attach because TRIA trumps foreign sovereign immunity. Exactly, Your Honor. So in our view, and so let me just pick up right there, TRIA reflects Congress's judgment that when assets come under control of a terrorist party and are blocked, those assets should be available for victims of terror. And the text of TRIA reflects that judgment, expressly making available for victims, quote, blocked assets of any agency or instrumentality of a terrorist party. TRIA then requires that our motions be granted because we have final judgments against the Taliban. DAB is an agency or instrumentality of the Taliban under Khrushchev. How did the government get the first three and a half million, billion, whatever it is? Is that wrong now? No, Your Honor, and we didn't object to that. The government issued a license which allowed that money to be transferred over, and then that money was sent out to a Swiss trust where it is waiting to be held. But if TRIA trumped, why wouldn't you have gotten that money as well? Because TRIA only applies, this court addressed this question in Smith, and what the court said, TRIA only applies to the, you need to have, it's only to the assets that are blocked at the time of the writ of attachment. I see, so you didn't have a writ of attachment at that time. We didn't. Or did you? We did, we have filed a writ of attachment. But that's my problem. Right. If you didn't have a writ of attachment, that follows easily. So we had a writ of attachment. But we didn't have a writ of attachment. We did have a writ of attachment. That was filed in August 2021. We hadn't filed the turnover motion yet. But we didn't object when the government transferred it. I know you didn't object. Yeah. But couldn't people other than yours say you should have objected? Because under your argument now, if we buy your argument now, you should have gotten the initial one because you had a writ of attachment. So the $3.5 billion, that may be, Your Honor. And it may be we're only fighting now about the $3.5 billion that's still there. I understand. Yeah. But the validity of your argument now, in a way, has to depend on the other. That is, if we decide for you now we're saying that somehow something was done wrong before, which would be an argument against deciding that TRIA does what you say. So, Your Honor, I don't want to fight too much. But there are two separate things, right? One is the writ of attachment. One is the turnover motion. There are various challenges raised by various people, including people sitting at the table here, to the writ of attachment and to the turnover. So the analysis actually is different for the writ of attachment than for the turnover. So there is no dispute that the turnover is post the $3.5 billion, and that's what we're trying to seek. But I don't see in TRIA the distinction you are now making. No, I'm not making a distinction between writ of attachments and turnover. I'm saying there's a challenge to our writ of attachment. And we think it's valid, but Judge Daniels could conclude otherwise. And so what's critical is that there is a turnover motion that's filed where the $3.5 billion are there. But we agree, Your Honor, that if the writ of attachment were valid and the government transferred out, the way we would think about it is that the government could transfer it out under Dames and Moore, but we might have a takings claim. But that, Your Honor, is like there's enough on the table, I think, already. But that's how we would – if Your Honor asked me how would I think about it, that's how I would think about it. There's a blocked asset. We have a writ of attachment. The government takes it away under Dames and Moore. We have a takings claim against the government. But to say that isn't briefed is a long way away. But if I could – I'm sorry, Your Honor. And we add to this that the government, while it's very clear on other things, on the question of what DREA does, just say, please decide. We don't know what's going on. I think that's the fairest reading, Your Honor. And so what I'd like to do is suggest the way the court should decide it. I think that's right. The government has largely – it hasn't shown up in this case, and what it filed below was sort of inconclusive. I think the way to – Can we do that? Can I just – I want to clarify one thing. So from the questioning for the last case, I suggested that maybe there is no state of Afghanistan, and that would then just sort of stop all of this. Correct, Your Honor. That's where I started. But that's not an argument you have made. So it's not the argument we have made, but our – So why isn't that the place to start? So why isn't that the place to start? So we're happy – I don't want to fight too hard, Your Honor. If you go there, we win, and so I'm happy. So I don't want anything I say to be – Well, why do you want to win? But the reason – if I could answer Judge Sullivan's question, the reason is precisely the one that I think the – that I think it was Judge Calabresi mentioned, which is there is some tension with what the United States' view is on whether Afghanistan is a state. So, again, I don't want to push too hard – Well, it might be, but we don't defer to them, right? I mean, you would agree with Mr. McGill that we don't blindly defer to the government on this. The fact that the government can recognize a foreign government or not, that's their exclusive power, doesn't mean they get to decide what is a foreign state under the Foreign Sovereign Immunities Act. Absolutely, Your Honor. And so that's why I started the argument saying if you go with the direction that Mr. McGill has urged, we're an a fortiori. We have final judgments. Then there's no sovereign immunity, and so we are fully on board. What we're saying is you don't have to – even if you don't go that far. So, like, that's sufficient for us to win. And if there are – I recognize you have other arguments you want to make. I just wanted to clarify. Totally. That would be simple, and there's a benefit to simple.  But there would be other complications. But you're not offering any other complications for that. No, Your Honor. I'm not offering any other complications other than the ones that the other panel members raised in the Mr. McGill address. So I – we're not – if this court believes that the assets aren't sovereign, we win. As I say, there's a – our – the only thing I would say is our plaintiffs have final judgments. At the time of the attachment in Owens, they did not have final judgments. We think that has implications under TRIA because TRIA only applies and lets people execute on blocked assets when there are final judgments. But that has nothing to do with the sovereign immunity piece. And so we completely agree, if Your Honors decide – Well, then it would get duked out in the district court on the basis of New York law. I think that's right, Your Honor, although I think it does have some impact on the decree, the language that the court uses. The question of whether you would order attachment notwithstanding TRIA's restrictions on blocked assets seems to me complicated. So I think our case doesn't present that complications, and I don't want to – you know, I don't want to – I'm raising for the court that TRIA applies to final judgments. You can only access blocked assets, sovereign immunity aside. You can only access blocked assets when there's a final judgment, not a prejudgment attachment. I just wanted to be clear that you are not – the fact that you didn't make that argument that they made should not be taken by us as having you abandon or forfeit that. No, I don't think so, Your Honor. I think once immunity is gone, I think then we win sort of a fortiori. Yeah, you said that, but did you make the argument? So we did make the argument below on the alter ego front. That argument is what we made in our turnover motion. I'm just asking – I totally understand. But – so let me then say, like, again, on the assumption that the court doesn't reach that, I'd like to address why the district court's argument was wrong even if there was sovereign immunity, recognizing, Judge Sullivan, that everything I say from here on may be irrelevant. But the district court denied our motion. I want to make – I want to address sort of up front, deep into it, two aspects of it. First, the district court concluded that Section 1604's jurisdictional immunity forecloses relief. But 1604 has no application here. Our turnover motion does not seek to hail into court any sovereign. It does not seek an in personam judgment against any sovereign. Instead, all we're doing, Judge Sullivan, is under New York law, we are attempting to seize property held by the Federal Reserve Bank of New York, which has no immunity. I agree with you that the question of jurisdiction is absurd because there is no immunity of a Federal Reserve Act quite apart from what TRIA would give you. So you obviously can come in. The more interesting question is the district court incorrectly ruled in your case on DAB's foreign sovereign immunity when DAB wasn't even there. The question is, if all – if we don't agree with Mr. McGill, then isn't DAB a necessary party? And when it comes to a necessary party, that's when we would have to decide whether foreign sovereign immunity is, because you can't join a party under foreign sovereign immunity, which is necessary. And so that while the court was wrong in saying, deciding the foreign sovereign immunity as it did, the same question would come up under a Rule 19 dismissal. So I think it wouldn't, Your Honor, and let me explain why. I understand the question. The reason is, the analysis is different. Rule 19 says, a person shall be joined as a party in the action if, and I quote, the person claims an interest relating to the subject of the action. Thus, a precondition to Rule 19 is actually that the party, the sovereign party, shows up and makes the claim. This court held that in Peregrine, right, which I think is 89F3rd at 41. This court held if the foreign sovereign doesn't show up under Rule 19, then we don't, the court doesn't, Rule 19 isn't triggered. Second, I think, you know, sort of underlying Your Honor's question, I think is the Pimentel case, and I think there really is a critical difference between us and Pimentel. Pimentel was an interpleader action, right? So the defendant in Pimentel was literally the government of the Philippines, right? Our case is very different. Our case proceeds under New York law as it happens every day. You sue the bank, right? You don't have to sue the underlying. Then what happens is, of course, DAB can come in and dispute whatever it wants, and we gave notice to DAB. We served DAB. We even complied under the FSIA, although we don't think we necessarily had to. And, of course, as this court knows from case after case after case, instrumentalities routinely come in and contest, and DAB did not. So we don't think that the court needs to get there through a Rule 19 in terms of jurisdictional immunity. Of course, the DAB retains execution immunity, and for sovereign entities, that normally is a really big deal and satisfies a lot of the problem. Of course, in this case, TRIA addresses that directly, and nobody disputes, right, that TRIA abrogates the execution immunity. And so applying New York law, as Judge Sullivan said, we think this is actually a pretty straightforward case. We sued the garnishee. There's no jurisdictional immunity in the garnishee. There's no Rule 19 problem because DAB didn't appear. DAB retains execution immunity, but TRIA abrogates it, and we think that basically is the end of the story. So then you say, like, so why are we here? How did we get here? Well, I think what was really driving the district court was some concern that notwithstanding the plain text of TRIA, it was somehow anomalous or unfair for a judgment against a terrorist organization to be enforced against a sovereign entity as an agency or instrumentality. But we don't think there's any anomaly at all. When a terrorist organization takes over a sovereign entity and weaponizes its assets to advance a terrorist agenda, it's not anomalous at all for Congress to have chosen to make those assets available to victims of terror. And in particular, there's no anomaly because Congress wouldn't have been at all surprised that TRIA might apply to an entity like the Taliban, whether it supervises day-to-day control over DAB. Why is that? Because in 2001, when TRIA was proposed, that was exactly the situation on the ground in Afghanistan that the Taliban was in control. And President Clinton had previously blocked DAB assets precisely because DAB was controlled by the Taliban. So there's no anomaly for the judge to be fixed there. And indeed, I think that is sort of the central insight of this court's decision in Kirshenbaum, that when you—the reason the court didn't look to the FSIA to determine what agency or instrumentality means in TRIA is because it understood that entities like the Taliban operate in the shadows. And when they essentially take over a sovereign entity, and it's like zombified almost, and use it for terrorist aims, of course those assets should be available. And that's what TRIA is about, right? TRIA is about making assets available to victims of terror. Now, Your Honor raised—Judge Calabresi raised this question, well, you know, isn't this unfair, or couldn't you view this—not you were saying, but couldn't one say that this is unfair to the people of Afghanistan? And we think, actually, that's fundamentally at odds with the judgments of the political branches. Remember, what TRIA does—what TRIA came into— Well, it depends on how we read TRIA. Yes, but what TRIA was indisputably—what I think there's no dispute— is that TRIA was meant to overcome the executive branches reserving money through blocking, essentially to give to countries later as the State Department saw fit. And there you come right back to my original problem, then how the hell did they get the first three and a half million? Because if your argument is all correct, they had no right to get that money for the people of Afghanistan if Congress has said that this money under TRIA must go to the victims. So, you know, I'm not saying—and maybe the whole case can be simply decided— Yeah, but Your Honor, whether or not we could have objected to that earlier three and a half billion, I mean, we— I'm not asking whether you could have objected. I'm asking about whether the fact that that was done without any objection should tell us something about the meaning of these laws. Because you did a lot of talking about what Congress just meant, and yet some people evidently thought that something different was going on when they got three and a half billion, and you or people like you did not then object. I'm not saying—you know, I'm just asking what that tells us about how we should read what Congress meant by TRIA given that so much money was taken out and nobody did anything other. Now, if we agree with Mr. McGill, we don't get to any of that stuff. But I am puzzled by this fact that you tell us Congress clearly meant this money to go there, and yet half the money went elsewhere, and nobody said anything. Yeah, so, I mean, there are a number of things, Your Honor. I mean, first of all, I do think, like, the litigation judgments that we made or may have made don't inform how the statute operates. Second, at least for the hapless plaintiffs, like our judgment under TRIA was $2.1 billion, and so it's— Yeah, you keep coming back to your right to these for these reasons, but I keep coming back to say when you say TRIA means something, we have some acts that occurred with nobody objecting that would seem to suggest a different meaning. So I don't— And either that was wrong or what's going on. You know, I'm just puzzled by that question. I'm not questioning your argument as a lawyer. I'm just saying what do facts tell us about the meaning of laws? Yeah, and I guess I think in this case, Your Honor, it really doesn't tell us anything. Our position—you're asking about the things that we did. Our position from the beginning has been that TRIA allows us to execute on these assets, whether they would allow us to execute on other assets or whether if the government did something now how that would affect our claims, it seems to me isn't really the question before the court. Isn't the government's freezing and ultimate seizure of $7 billion and then $3.5 billion that they moved to other accounts for humanitarian purposes, isn't that really an IEPA question? I think it might be, Your Honor. I mean, the question has to do with the licensing scheme. Honestly, like Mr. McGill, I'm sort of not the expert on IEPA. Well, I'm not sure that judgment—you know, the folks holding judgments like you get to object to the government's exercise of its authorities under IEPA. Right, and we didn't, Your Honor. I think the critical thing for us is, like, there still is the pot of $3.5 billion. We are not competing—well, but it's important, Your Honor. We're not competing with the United States for the money, right? The United States—this would be a live dispute if the United States were in here saying, we want that other $3.5 billion, and then we would have that out. But right now the question is, is this available to us under TRIA? And we think that that actually is unambiguous under the statutory language.  And so— When you say it's unambiguous under the statutory language, you're telling me something which I can look to and I can read. Yes. When you spend a good deal of time instead, as you did, telling me because Congress must have meant this, because Congress must have meant that, because Congress must have meant the other thing, that's where I get it. Totally, Your Honor. Because there I find that other things were done at other times. I get that, Your Honor. And that's why I started my argument with the text, right? The text is the text of 201A, which says the blocked assets of the terrorist party, including the blocked assets of any agency or instrumentality of that terrorist party, shall be subject to execution or attachment in aid of the order to satisfy the judgment. That is what we're relying on. That and the definition of a terrorist party, which unambiguously includes the Taliban. And so we don't have to get to what Congress had in mind, although we do think that the fact that Congress was trying to deal with getting around the juridical separation that Banchek had set up and made clear, that Congress was responding to that, is relevant. We also think it's useful and relevant to the court that actually this was the fact on the ground in the Taliban. But at the end of the day, all that is doing is giving life to what we think is pretty unambiguous text. And actually, when you look at the district court opinion, it didn't have any textual argument, right? The district court seemed to think, well, you could limit this to state sponsors of terror, but that's nowhere, nowhere, nowhere in the text. When you look at the definition of a terrorist party, it includes not just a state sponsor of terror, right? But under D4, it includes a terrorist, a terrorist organization, or a foreign state. And so I think there really isn't ambiguity. What I am mostly trying to get at with this discussion of the other things, Your Honor, is to respond to the district court, who I took to be sort of straining to get around the plain language because he had some sense that this was not the right, that it was either unfair to the people of Afghanistan, that it was unfair to DAB, or that it was sort of unfair to the central bank to have them be an instrument of government. Well, anybody who thinks they have a claim to this money could come forward in the proceeding under New York law to say that's actually my money, that's not the Taliban's money. Absolutely, Your Honor. And that to us is the critical point in terms of the fact that we served DAB. DAB could come forward. Prior other agencies and instrumentalities have retained counsel in the U.S., sophisticated counsel in the U.S., and made these arguments. The court sees it all the time. Bank Melly, Bank Markazi. This is not something new. And, of course, what we think should happen here, if I could address kind of the de crudo language question a little bit. Well, maybe do that. I mean, we are way, way over. Yes, Your Honor. I appreciate your indulgence. But to get to sort of Judge Cabranes' question, which is always like the first question is what are you asking the court to do? What we are asking the court to do is to remand, to reverse and remand to the district court with instructions to grant the turnover motion. Now, I want to be very clear about what that means and doesn't mean. We do think that the district court should grant the turnover motion. It's not really disputed that we meet the requirements of the turnover motion. There's a dispute about our writ of execution, which the Ashton plaintiffs have raised. But a writ of execution is not necessary for a turnover motion. So the court should grant the turnover motion. Then, under New York law, as Jed Sullivan has suggested, we would have a 5239 proceeding at which the court would have to establish the various priorities, including under 5234B of New York law, which establishes priority in time. And at that point, we would duke it out as to whose writs were, you know, whose writs were first in time. But the execution, we get that. But we want to have to hear from them about whether a turnover motion or not. I think we really should hear from them. Yes, for sure, Your Honor. And if I could just prebut, because I don't think I necessarily get a rebuttal in this odd situation where I would just say, can I make two quick points, Your Honor? So the first point is the writ of attachment one, right? We think the writ of attachment is valid. But regardless of what you think on that, a writ of attachment under New York law is not necessary for a turnover motion. Second, you will hear, I think, that the court should take into account through its equitable powers and things like that to change the priority. No, we will hear what we will hear. Okay, so can I respond to what I think you might hear? Just to get the response out, which is we think New York law controls that, but we're not asking the court to decide it. That would be for Judge Daniels to sort out in the 5239 proceeding on questions of timing and can you overrule the timing. All we're trying to do here is anchor in the turnover motion. Let me stop a second. Yes. If we decide that we agree with the previous case.  And don't get into any of Atria and what it does or does not do, then don't we just send everything back then to the district court and not get into this issue at all? I think the court certainly could do that. We are asking for an additional step, but I recognize that the court doesn't have to. That's correct, Your Honor. But if we decide on the other, then that simplifies matters greatly, makes life maybe more complicated for the district court, but doesn't get us getting into arguments which are pretty hypothetical. So, Your Honor, I have to agree. We've made our request. You've heard it. And we think it's pretty straightforward. But we get that the court might resist that and send it all back, deciding there is no immunity. Thank you, Your Honor. Thank you, Mr. Gershengorn. We'll now hear from Mr. Zacharoff. Good morning, Your Honors. May it please the Court. Samuel Zacharoff for the Action Plaintiffs. Let me start with the decree. Judge Calabresi, we fully agree that the only decree that should come from this court is a reversal of the district court on the question of whether the funds are available and then everything else should go back. And let me introduce some procedural questions as to why that's so, just to protect ourselves in case there have been requests both in this case and in the prior case for the court to go further. There is pending before this court an action called the Wodenshaw case, which has been held on reserve pending whether or not there are any funds to distribute. In Wodenshaw, some of the Ashton plaintiffs filed a class action under 23B1, a limited fund, seeking to have an equitable distribution of any portion of the $3.5 billion, which might ultimately be awarded to victims of various Taliban activities. The district court on its own motion dismissed that and said, I have full powers as the MDL transferee court, so this is redundant and not necessary, and therefore I dismiss it. We will submit when we come to this court that that's categorical error under the Supreme Court's decisions in Lexicon and Gelboin that the MDL transferee court does not have final merits disposition of all the cases that are joined on a pretrial basis. One of the issues that's going to be posed there is the basis for B1 distribution. And here, Judge Sullivan, I want to introduce something which has not come up yet. We do not concede that New York law controls in all regards in terms of the disposition of the funds. Judge Caproni thought it did. Judge Caproni thought that the temporal priority would be controlling ultimately, and that's what the Havelish plaintiffs are seeking. They're seeking the overwhelming bulk of the money because they rush to execution just a little bit faster than everybody else. Well, look, New York seems to reward that. I mean, if you went through bankruptcy, you wouldn't get rewarded for that, right? That's correct, but I want to introduce a caveat on whether New York law controls there. Under Rule 69, we look to New York law to the state law where the court sits unless there's federal statutory authority on point. And here, I'd like to turn the court's attention. Again, this has not been addressed below because we were thrown out before we could raise this below. But under Section 1605AG, subsection G of that's the U.S. Code codification of TRIA, the order of priority is not the disposition of the assets, but rather, and this is the quote from the statute, the filing of a notice of a pending action shall have the effect of establishing a lien of lease pendants upon any real property or tangible property that is subject to attachment in aid of jurisdiction. Now, the classic texts on equity, Snell, Pomeroy, texts like that, talk about a statutory lien of this sort as an action in equity. And equity has its own principles on the appropriate distribution among different claimants. And so this we would submit. It overrides the New York statement. Wait a minute. If there's a New York statute, I mean, these cases are brought under New York law, right? This is the attachment, the claim is under TRIA. It's one way out from under the Foreign Sovereign Immunities Act, right? It's a way to get out from under the immunity that would otherwise apply to a foreign state actor or its instrumentality or agent. Do I have that right? In part, Judge Sullivan, because I think that it does with regard to the FSIA part. But with regard to TRIA, I do not think it does. But there's no cause of action been brought under TRIA, has there? That's correct. That's correct. So this is a state court action to basically execute on a judgment, right? That's correct. You don't have a judgment of your kind yet, do you? We have judgments, yes. Most of them have judgments. They don't have execution rights or they're being gotten. All right. Well, anyway, so it seems to me that what you're saying is that these New York actions to enforce judgments against assets of the defendant who's liable is nonetheless going to be trumped by TRIA, which I always thought was designed just to give sort of an off-ramp for immunity for terrorist organizations. I think it goes further than that. And here I have to agree with Mr. Gershenhorn, who said something to the effect of that TRIA liberates the assets. What I want to know is was any of this discussed or decided by the district court when it said New York law? But once it said that everybody was out because of foreign immunity, everything else that it said was blather because it didn't matter. So my question is before we speak about issues on which there is argument, should we simply say that what the New York lower court may have said but without thinking about it should be thought about so that we don't need to decide whether it's New York law or banana law. If we decide that foreign sovereign immunity does not protect these assets and therefore the district court was incorrect from the beginning and our decree should simply be you were incorrect from the beginning, now do all the rest. Judge Calabresi, we agree 100% with that resolution. We think that's what we're here advocating. We have some additional points as to why we think it was incorrect. But the main point that we're here saying is please do not reverse and render because all of these issues were not presented below. And what's more, there is a class action pending, which would guarantee the equitable distribution. And that action might have priority in terms of a decision of this court over what happens in that one. That's correct, Your Honor. And that case has been pending because there's no case of controversy if there's no assets to be had. And so we needed to resolve the question of whether the assets would be liberated or not before we could get to that. And the case is fully briefed. We're ready to go. We've just been waiting the decision of this court. Mr. Zakharoff, can I ask you this question as I ask the others? So if we were to find that Afghanistan is not a foreign state under the restatement and under our case law, that means the FSIA issue goes away, right? That's correct. We have no issue with that, Your Honor. You have no problem with that. That's correct. Thank you. That's correct. If I may have one second. Of course, Your Honor. You're chief compared to this. Yes. That's what he tells me all the time. But on the substantive question, we think there's two issues which have not really been addressed. The district court's opinion cannot be reconciled with this court's decisions concerning Iran in cases like Kirshenbaum and the Malaysia Bank case, Levinson v. Malaysia Bank. Iran is, for all practical purposes, indistinguishable from Afghanistan under the Taliban. It is a regime prone to terrorism. It is a regime which we have never recognized. The United States has never recognized as a legitimate state. And this court, as it said in Kirshenbaum, has allowed multiple actions against Iran by victims of terror. And in the Kirshenbaum case, it allowed one of the instrumentalities of Iran to have its judgments, its assets attached in order to satisfy these judgments. There's no difference between Iran and Afghanistan for practical purposes now. And so on that ground alone, I think the district – But there are some – I mean, there are some differences in terms of whether Afghanistan is a foreign state, it would seem to me. I mean, Iran is – meets the various criteria, it would seem to me, under the restatement, wouldn't you? I think Iran does, but I think the more relevant question is did Afghanistan at the time of the terrorist acts in question meet that definition under the restatement? I think that's a harder call, Your Honor. But you say basically your position is, if anything, a fortiori from what we have said about Iran. That's correct. That's correct, Your Honor. I would also raise one other paradox, which is the events in question took place in 2001. And at that time, the Taliban controlled Afghanistan in very much the same way that the Khomeini regime controls in Iran. If our intervention in Afghanistan had failed and had never dislodged the Taliban, then this case would be, subsequent to the passage of TRIA in 2002, would be an action against the Taliban-led Afghanistan in the same way. The paradox here is that some of the amici take the position that because the Taliban was dislodged and then came back, that that grants greater immunity to the DAB assets than would otherwise attach. And I think that that conceptually can't be right. That just is a jarring fact. So we would submit that either under the Iran case or under the fact that the Taliban was in control of something like a state in 2001, that foreign sovereign immunity... But these are all arguments that you are making in support of a position that was made in the prior case, which, if it comes out as they want and as you want, settles everything. Yes, Your Honor, that is correct. And it's also consistent with the position. I mean, it's not inconsistent with the position Mr. Gershenhorn advances. The only conclusion, though, is that if these are all linked arguments, we think both the prior case and this case have to be subsumed within the pending class action B1, because we have limited assets. That's not for us. That's not for you to decide. I just caution that in both cases, the decision of this court should not compromise those assets before all these questions can be addressed in terms of the distribution. But I'm not sure I understand what you're saying about why it is that the Foreign Sovereign Immunities Act turns on the status of the defendant, the Taliban, at the time of the crime, as it were, or the tort, as opposed to the time of the attachment or the judgment. This is an issue which has not been briefed, and I'm not aware of case law on this, but it seems to me that the best reading of what gets this out from under FSIA immunity is that the foreign government engage, the foreign entity engage in terrorist activity. But it's about hailing them into court now. It's not about hailing them into court 20 years ago. That is correct. That is correct, Your Honor. I don't know that this matters that much, but I was puzzled to hear you say that we should be looking as to the conditions on the ground in 2001. Because I'm struggling with the fact that it is the same group that is back in power today that in 2001 committed these acts. And in 2001, they would not have had immunity under any circumstances. And so the question is, why would they have it today? And one possibility that Your Honor raised is that, in effect, Afghanistan is a failed state now, so it falls outside the state category altogether. But if that's the case today, they didn't acquire immunity between the time they undertook these acts in 2001 and today. It's something that has not been addressed in the case law. So I just find it a paradox. And if this court goes through the 15 possible reasons to reverse the two lower courts, and is still in... But it might be interesting if at the time the acts were made, this was a state covered by Foreign Sovereign Immunity Act. Then we'd have to decide which is the time that matters. And you say it doesn't matter that you do that, because even if you looked then, it would not be subject to that. That's correct. The only thing that would be different... ...or whether we look then, if we look where the money is now, or when the acts happened, at no time was it covered. And so we should decide the prior case the way they want, either way. That's correct, Your Honor, with just one small caveat, which is the TRIA did not exist at that time. TRIA comes into... But other than that, I fully agree, Your Honor. Thank you. All right. Thank you. Thank you very much. Judge Kibanis, did you have any questions? I don't want to leave you out. You're on mute. You're muted. We can't hear you. We can't hear you. There you go. Yes, now I'm fine. All right. Okay. Thank you. Well, after this marathon, we will reserve decision. Thank you both. Thank you very much. Well argued and certainly interesting.